UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| MICHELLE PETIE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 23-11895-DJC |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM OF DECISION

CASPER, C.J.                                                                July 24, 2026

## I.      INTRODUCTION

Plaintiff Michelle Petie ("Petie") filed this lawsuit against Defendant United States of America ("Defendant" or the "government"), seeking damages for negligence pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674 et seq. See D. 1. Petie alleges that an employee of the United States Postal Service ("USPS"), operating a government-owned vehicle, negligently rear-ended the vehicle in which she was a passenger while it was stopped at a red light on August 22, 2021. Id. After a bench trial, D. 56-59, the Court now issues its findings of fact and conclusions of law and enters judgment for Petie in the amount of $2,600.

## II.     PROCEDURAL HISTORY

Petie instituted this action on August 18, 2023, asserting one claim of negligence against the government for the alleged negligence of the USPS employee on August 22, 2021. D. 1 at 2-4. The Court conducted a bench trial between November 17, 2025 and November 20, 2025. D. 56-59. Petie testified and called Stephen John Petie ("John"), her husband and the driver of the vehicle in which she was a passenger; Thomas Griff Hall, II ("Hall"), the driver of the USPS vehicle; and

medical expert Dr. Simon Chao ("Dr. Chao"). The government called Dr. Robert J. Banco ("Dr. Banco"), its medical expert, and David Bizzak, Ph.D., P.E. ("Dr. Bizzak"), an accident reconstruction expert.

## III.  FINDINGS OF FACT

In light of the evidence presented to the Court, the Court makes the following findings of fact:[1]

### A.  The Collision

1.  On Sunday, August 22, 2021, at approximately 10:00 a.m., Hall, a City Carrier Assistant at that time, was driving a USPS Long-Life Vehicle ("LLV") on John Fitch Highway in Fitchburg, Massachusetts. D. 60 ¶ 1; D. 61 ¶¶ 1, 4, 10.[2]

2.  Hall had been an employee of USPS for approximately two years at the time and was acting in the scope of his employment in operating the LLV, a vehicle owned and maintained by the government. D. 61 ¶¶ 10, 12, 14; D. 60 ¶¶ 1-3.[3]

3.  USPS is an agency of the government. D. 61 ¶ 13.

4.  Hall was delivering Amazon packages for USPS on the day of the accident. Id. ¶ 56; D. 60 ¶ 3.

5.  On that day, an "Amazon Sunday," D. 61 ¶ 56, Hall was not driving his usual route but was set to deliver packages as designated.[4]

6.  At the time Hall was driving, the weather was rainy and the roadway was wet. Id. ¶ 15; D. 60 ¶ 4.[5]

---

[1] The Court heard witness testimony on each day of the four-day bench trial and cites the draft trial transcripts as [Day]:[Page]. The Court also cites the parties' respective proposed findings of fact and conclusions of law, as revised post-trial, D. 60; D. 61, and the trial exhibits.
[2] I:20-21.
[3] I:21.
[4] I:23.
[5] I:33, 67.

7.      Before he began driving his route that morning, Hall performed a safety check of the LLV, including a check of the brakes, and did not identify any safety issues.  D. 60 ¶ 5.[6]  Hall was aware that he needed to use caution while driving the LLV in the rain.  See id. ¶ 6.[7]

8.      The collision occurred in Fitchburg, at the intersection of John Fitch Highway and Pearl Street, which are both two-way streets.  D. 61 ¶¶ 4, 8; D. 60 ¶ 6.

9.      There is a traffic light at this intersection.  D. 61 ¶ 6; D. 60 ¶ 7.  For approximately a quarter mile leading up to the intersection, John Fitch Highway is fairly straight and without obstructions.[8]

10.     Petie was the front passenger in a Mercedes-Benz GLC 300 ("Mercedes"), D. 61 ¶ 9; D. 60 ¶¶ 9, 12; Exh. 3-b at 0002, which John was driving.  D. 61 ¶ 1; D. 60 ¶ 12.[9]

11.     There was a red light at the intersection, so John stopped the Mercedes.[10]  See D. 61 ¶ 17; D. 60 ¶ 12.

12.     At the time of collision, the Mercedes was stopped short of the stop line at the intersection.  D. 60 ¶ 12.[11]

13.     Hall was driving the LLV behind the Mercedes.  D. 61 ¶ 20; D. 60 ¶ 9.

14.     The LLV's speed at twenty-five to thirty feet from the Mercedes was approximately thirty to thirty-five miles per hour.  D. 60 ¶ 6; D. 61 ¶ 28.

15.     Leading up to the intersection, the speed limit on John Fitch Highway decreases from thirty-five miles per hour to twenty-five miles per hour.  D. 60 ¶ 6.[12]

---

[6] I:27-28.
[7] See I:33.
[8] I:28-29, 66-67.
[9] I:67-68, 117.
[10] I:69, 91-92.
[11] I:69, 92, 158.
[12] I:33, 66.

16.     As he was driving, Hall was aware that he was approaching an intersection.[13]

17.     Hall admitted that the collision could have been prevented had he been driving slower.[14] D. 61 ¶ 51. The Court credits Hall's testimony that at the time he began to apply his brakes, he was going between thirty and thirty-five miles per hour, above the posted speed limit of twenty-five miles per hour. See id. ¶¶ 29-30.[15]

18.     Hall applied the brakes and turned wheel so that the LLV did not make full impact with the Mercedes but instead, after the LLV slid on wet pavement, its front left bumper hit the right back bumper of the Mercedes. D. 60 ¶ 9; see D. 61 ¶¶ 27, 31.[16]

19.     Although John testified that he believed Hall was holding a cell phone around the time of the collision,[17] see D. 61 ¶ 53, the Court credits Hall's testimony that his cell phone was mounted on the dashboard and his hands were on the steering wheel.[18]

20.     The airbags in the Mercedes did not deploy upon the collision. D. 60 ¶ 13.[19]

21.     Photographs taken of both vehicles showed minimal damage to either vehicle. Exh. 3-b. Neither Petie, John nor Hall sought medical attention at the scene, and an ambulance was not called.[20] See D. 60 ¶ 10.

22.     In the moments after the collision, Petie was not experiencing any pain.[21] Id. ¶ 15.

23.     Both John and Hall were able to drive their vehicles away from the scene of the accident.[22] Id. ¶¶ 10, 16.

---

[13] I:55.
[14] I:44-45.
[15] I:38-39
[16] I:55; see III:86.
[17] I:70-71, 94.
[18] I:56.
[19] I:118.
[20] I:58, 97-99, 120.
[21] I:158-59.
[22] I:60, 76.

24.     Although Petie and John had been heading to Target for errands before Petie's drive to New York for a work conference later that day, they first took the Mercedes home because the sensors in the vehicle were beeping and they were concerned about driving it further.[23]

25.     They drove to their residence nearby, switched cars and then drove, as planned, to Target.[24]  D. 60 ¶ 17.

26.     A few hours after the low-speed collision, Petie drove to New York as planned.[25] See id.

27.     Hall described the impact with the Mercedes as a small fender-bender.  Id. ¶ 9.[26] He estimated that at the time of the collision, the speed of the LLV was approximately ten miles per hour.  Id.[27]

28.     Hall's description is consistent with the opinion of the only accident reconstruction expert to testify, Dr. Bizzak.  Dr. Bizzak testified that an impact speed of no more than seven to eight miles per hour was consistent with objective evidence in the record, including photographs from the scene of the collision and repair records for the LLV and Mercedes.[28]

29.     Dr. Bizzak testified that the damage sustained by the vehicles is consistent with a low-speed collision and did not result in structural damage to either vehicle.[29]  Id. ¶ 11.

### B.     Medical History

30.     Prior to the August 22, 2021 collision, Petie sought medical treatment for neck pain and other ailments.[30]  D. 60 ¶¶ 18-26; D. 61 ¶¶ 64-71.

---

[23] I:76, 120-21.
[24] I:121.
[25] I:79, 121.
[26] I:56.
[27] I:39-40.
[28] III:94-95, 102-03.
[29] III:90.
[30] I:91, 123-25, 151-57.

31.    On August 25, 2020, approximately one year prior to the collision, Petie contacted her medical provider concerning several months of off-and-on neck pain, exacerbated by a "lawnmower incident." Exh. 1-a at 000068. She visited her medical professional on August 31, 2020 concerning ongoing pain on the right side of her neck. Id. at 000061-62. She stated that the neck pain started several months prior, and her symptoms had never fully resolved despite trying heat, ice and gentle stretching. Id. at 000062-63. Petie's medical provider recommended, among other things, a low-dose muscle relaxer at night and to continue with heat, ice and gentle stretching. Id. at 000063; see D. 60 ¶ 20.

32.    On May 12, 2021, approximately three months prior to the collision, Petie contacted her medical provider to complain of neck pain and stiffness that had been affecting her for a couple of weeks. Exh. 1-a at 000024. Petie complained of pain in her neck when looking from side to side. Id. She characterized the pain as an ache, and constant. Id.; D. 60 ¶ 22.

33.    During a medical appointment on May 13, 2021, Petie described her right neck pain as an ongoing issue with a flareup during the prior six weeks. Exh. 1-a at 000017-18. Petie's provider recommended an x-ray and gentle stretching. Id. at 000018. Petie declined physical therapy. Id. Her provider diagnosed Petie with chronic neck pain. Id.; D. 60 ¶ 23.

34.    A May 13, 2021 x-ray of Petie's cervical spine demonstrated minor degenerative changes. Exh. 1-a at 000014, 001326. There was mild C4-C5 disc space narrowing, normal alignment with normal vertebral body heights and normal prevertebral soft tissues. Id. Petie's provider asked whether she would like to see an orthopedist. Id. at 000014; D. 60 ¶ 24.

**C.    Post-Collision Medical Treatment**

35.    At the time of the collision, Petie was fifty-four years old. D. 61 ¶ 48; D. 60 ¶ 12.[31]

---

[31] I:83.

36.     As noted above, a few hours after the low-speed collision, Petie drove to New York for a work conference in which she participated over the next two days.  The Court credits Petie's prior, sworn testimony that she experienced neck pain and a headache within ten to twelve hours following the collision and took Tylenol to relieve her pain.  D. 60 ¶ 27.[32]

37.     Petie also testified that she experienced dizziness and nausea while in New York.[33] While in New York, Petie contacted her medical professional on August 23, 2021, to report that she had been in a motor vehicle accident, that her neck and shoulders were sore and that she had a mild headache that had not gone away.  Exh. 1-a at 000343.[34]  Petie drove herself back to Massachusetts from New York on August 24, 2021.  D. 60 ¶ 28.[35]

38.     On August 25, 2021, Petie saw her primary care provider and complained of neck pain and vertigo.  Exh. 1-a at 000340.  Petie's provider reviewed with Petie "the nature of whiplash injury and possible concussive symptoms."  Id.  Petie's provider ordered an x-ray and CT scan. Id.; see D. 60 ¶ 29; D. 61 ¶ 75.[36]  The imaging from Petie's August 25, 2021 x-ray showed normal alignment with normal prevertebral soft tissues.  Exh. 1-a at 000337.  The imaging showed no fracture and no acute finding.  Id.; D. 60 ¶ 30.

39.     Petie underwent a CT scan of her head on August 27, 2021.  Exh. 1-a at 000330, 001328.  The CT scan showed some volume loss of the brain, which Petie's provider noted was likely age-related and was not related to her concussion.  Id. at 000330; see D. 60 ¶ 31.

40.     Neither the x-ray imaging nor the CT scan showed any acute findings.[37]

---

[32] At the trial, Petie testified that she began to experience pain right away, which worsened during the drive to New York and after.  I:121, 161-62.  On cross-examination, the government used her deposition testimony, where she had said that she first experienced pain approximately ten to twelve hours after the accident.  Id. at 161.
[33] I:137.
[34] I:122.
[35] I:81, 100, 163.
[36] I:122-23.
[37] II:62, 119.

41.     Petie reported experiencing tingling on her fingers, Exh. 1-a at 000334; D. 60 ¶ 32; see D. 61 ¶ 76, and, on September 7, 2021, Petie reported that she was "still having issues with [her] neck" and that she was experiencing tingling in her fingers by the end of her workday, Exh. 1-a at 000328.  She requested an MRI.  Id. at 000327.  Her medical provider offered physical therapy to Petie, but she declined.  Id. at 000327-28; D. 60 ¶ 33.  Her provider arranged for an appointment to determine the need for an MRI or an orthopedic consultation.  See Exh. 1-a at 000327; D. 61 ¶ 77.

42.     On September 15, 2021, Petie had a follow-up visit for her neck pain.  Exh. 1-a at 000323.  She presented with ongoing neck pressure and discomfort, primarily on the right side of her neck.  Id.  She also noted occasional numbness and tingling to her fingers.  Id.  Petie reported initially having a headache but noted that the headache had resolved.  Id.  She also denied blurred vision.  Id.  Her provider noted that she was most likely experiencing "right occipital neuralgia as well as ongoing whiplash type symptoms" and scheduled her for an MRI and visit with an orthopedist in light of her symptoms.  Id. at 000323-24; see D. 60 ¶ 34; D. 61 ¶ 78.

43.     Petie was scheduled to meet with Dr. Anthony Rivera, an orthopedic specialist, for further evaluation of her neck pain on October 19, 2021, but she canceled this appointment.  Exh. 1-a at 000458, 000465; D. 60 ¶ 35.

44.     Petie had an MRI on November 1, 2021, which showed a moderate bulging disc with mild central canal stenosis at C4-5 and no significant foraminal stenosis, and lesser disc bulging at C5-6 with no significant spinal or foraminal stenosis.  Exh. 1-a at 000459-60; see D. 60 ¶ 36.  Although Dr. Chao testified that the foraminal stenosis at C4-5 and C5-6 could cause nerve compression, see D. 61 ¶ 79, the Court credits Dr. Banco's testimony that there was no evidence

8

of nerve compression, <u>see</u> D. 60 ¶ 36.[38]  Similarly, although Petie notes that Dr. Banco did not discuss the tingling Petie experienced in her fingers in his expert report, <u>see</u> D. 61 ¶ 76, the Court credits Dr. Banco's testimony that this symptom was not due to radiculopathy because the MRI showed that there was no compression of Petie's nerves.[39]

45.    When Petie's MRI results came in, her provider recommended that she complete the appointment with Dr. Rivera.  <u>See</u> Exh. 1-a at 000460; D. 61 ¶ 79.  Petie presented to Dr. Rivera on November 17, 2021, complaining of ongoing neck issues.  Exh. 1-a at 000298.  She indicated that her headaches and dizziness had improved, but the dull ache in her neck had not.  <u>Id.</u> She also noted some numbness and tingling into her left fingers but explained that medication helped some with that issue.  <u>Id.</u>  Dr. Rivera diagnosed Petie with a whiplash injury that could be compounded by a small disc herniation.  <u>Id.</u> at 00299; D. 60 ¶ 37.  He also diagnosed Petie with cervical spinal stenosis and cervical radiculitis.  Exh. 1-a at 000298; D. 61 ¶ 81.  Dr. Rivera recommended that Petie start physical therapy and prescribed a steroid.  Exh. 1-a at 000299; D. 60 ¶ 37.  Petie did not begin physical therapy until March 2022.[40]

46.    Petie and her husband moved to Indiana in November 2021.  D. 61 ¶ 82; D. 60 ¶ 38.[41]

47.    Petie scheduled a primary care visit with Dr. Jessica Cox to establish care on January 31, 2022.  Exh. 1-b at 000002.  During this visit, Petie reported that she had previously been involved in a motor vehicle accident.  <u>Id.</u>  Petie was referred to physical therapy for right-sided neck pain.  <u>Id.</u> at 000006.  Her physical examination revealed normal range of motion in her cervical back.  <u>Id.</u> at 000005; D. 60 ¶ 38.

---

[38] II:75-76; IV:48-49.
[39] IV:107-09.
[40] III:21-22.
[41] I:129. The government's proposed findings suggest that the Peties moved in early 2022, but Petie testified it was in November 2021.

48.    In March 2022, Petie started physical therapy in Indiana.  Exh. 1-c at 000172. During an initial evaluation on March 2, 2022, she described her physical condition as "[n]ot painful but discomfort."  Id.  She asserted that she had discomfort with riding her motorcycle and running.  Id.  Petie's prescribed plan of care was twice-weekly physical therapy for four weeks. Id. at 000175; D. 60 ¶ 39.

49.    Petie completed a medical health questionnaire as part of her initial physical therapy evaluation on March 2, 2022 and indicated that her health was very good and that she exercised.  Exh. 1-c at 000198-99; D. 60 ¶ 40.  Petie also indicated that during the prior week, she had experienced mild to moderate tingling in her hand and had mild to moderate difficulty with sleeping due to pain.  See Exh. 1-c at 000198; D. 61 ¶ 84.

50.    Petie only attended four physical therapy sessions after her initial evaluation, fewer visits than her provider planned.  At her March 7, 2022 session, she provided a verbal pain rating of two out of ten and was noted to have good tolerance to exercises and no increase in symptoms. Exh. 1-c at 000176-78; D. 60 ¶ 41.  During her final session on March 21, 2022, Petie reported that she "did a lot with [a] staple gun over [the] weekend and ha[d] increased tightness and stiffness," and that she felt she was "having limited improvement."  Exh. 1-c at 000188.  Her physical therapist noted that Petie would benefit from continued sessions.  Id. at 000190; D. 60 ¶ 44.  Petie discontinued physical therapy after this session and did not tell her physical therapist that the sessions were causing her significant pain.  D. 60 ¶ 45.[42]

51.    On April 4, 2022, Petie had a consultation with Dr. Robert Vraney from Orthopaedic Associates.  Exh. 1-d at 000002; D. 60 ¶ 46; D. 61 ¶ 85.  She presented with right-sided neck pain that she reported was a result from the motor vehicle accident in 2021.  Exh. 1-d

---

[42] III:25.

at 000002; D. 60 ¶ 46.  Dr. Vraney recommended anterior cervical discectomy and fusion ("ACDF") surgery.  Exh. 1-d at 000003; D. 60 ¶ 46; D. 61 ¶ 85.

52.    Petie had a C4/C5 ACDF surgery on July 28, 2022 without complication.  See Exh. 1-d at 000029-31.

53.    Petie reported some post-surgery improvement in pain.  Exh. 1-d at 000032-37; D. 60 ¶¶ 48-49.  At her three-month checkup on October 31, 2022, Dr. Vraney indicated that Petie could move forward with "essential removal of restrictions."  Exh. 1-d at 000037; D. 60 ¶ 50.  At Petie's six-month checkup, Dr. Vraney noted that Petie's ongoing limitations with motion and discomfort could be related to remaining degenerative changes.  See Exh. 1-d at 000039.  Dr. Vraney noted that Petie had no restrictions and could work with a massage therapist or a chiropractor if interested, id., but Petie did not engage the services of either, D. 60 ¶ 52.[43]

54.    During subsequent checkups that Petie had with Dr. Vraney in 2023, Dr. Vraney reviewed contemporaneous imaging and noted no concerns regarding same, although Petie continued to report pain.  Exh. 1-d at 000040-47; see Exh. 1-e at 000008; D. 60 ¶¶ 54-56; D. 61 ¶¶ 88-90.[44]

55.    Petie presented to Deaconess Family Medicine on January 17, 2024, complaining of neck pain and dizziness.  Exh. 1-b at 000089-90.  She reported, however, that the radiculopathy down her arms had improved post-surgery.  Id. at 000089; D. 60 ¶ 58.  Petie was diagnosed with cervicalgia, decreased range of motion in the neck, chronic pain of both shoulders and insomnia and, at her request, was referred to neurosurgery.  Exh. 1-b at 000091; see D. 61 ¶ 91.

56.    On January 29, 2024, Petie received an MRI of her cervical spine.  See Exh. 1-e at 000011-12.  Although Petie asks the Court to find that this imaging "showed the start of adjacent

---

[43] III:33.
[44] III:36-37.

segment disease in the form of mild uncovertebral hypertrophy at C3-4, C4-5, C5-6," see D. 61 ¶ 92, Dr. Chao did not offer such opinion at trial, but instead testified that uncovertebral hypertrophy "could" be a consequence of adjacent segment disease.[45]  Dr. Banco testified that the MRI demonstrated no evidence of adjacent segment degeneration, and the Court credits that testimony.[46]

57.    Petie visited Dr. Kutluay Uluc for a neurosurgery consultation and examination on March 7, 2024, and reported continued neck pain.  Exh. 1-f at 000002-05; D. 60 ¶ 60; D. 61 ¶ 93. Dr. Uluc concluded that Petie was "mostly suffering from musculoskeletal pain" and "recommended conservative measures" such as physical therapy and pain management.  Exh. 1-f at 000004; see D. 60 ¶ 60.[47]

58.    Petie moved back to Massachusetts in 2024.  D. 60 ¶ 61; see D. 61 ¶ 94.[48]

59.    Petie continued to report symptoms of neck pain after she returned to Massachusetts.  During an initial appointment with Southboro Adult Medicine on August 1, 2024, Petie reported continued neck pain but reported that numbness in her hands had resolved post-surgery.  Exh. 1-a at 000439-43; see D. 60 ¶ 62.  Although Petie asks the Court to find that her symptoms during this visit indicated adjacent segment disease, see D. 61 ¶ 94,[49] as noted above, the Court credits Dr. Banco's contrary opinion regarding adjacent segment disease.  On September 13, 2024, Petie reported neck pain during an initial consultation with Dr. Antranig Kalaydjian at Southboro Orthopedic Surgery, and she agreed to receive a steroid injection.  Exh. 1-a at 000432-35; D. 60 ¶ 63; D. 61 ¶ 95.

---

[45] II:102-04.
[46] IV:65-66.
[47] III:37-38.
[48] I:130.
[49] See II:100-02.

60.     In January 2025, Petie saw a physician assistant, who noted that Petie led an active lifestyle, with thirty minutes per day of exercise in the evenings and regular walks with her three dogs. Exh. 1-a at 000829-30; see D. 60 ¶ 67.

61.     Petie engaged in occupational therapy in early 2025, and she generally reported little to no dizziness or headaches and some neck pain during these sessions. See Exh. 1-a at 000686, 000710, 000816-17, 000844, 000851-52, 000877-78; D. 60 ¶¶ 68-73.

62.     Petie also engaged in physical therapy beginning in January 2025. See Exh. 1-a at 000835-42; D. 60 ¶ 71. Over time, Petie was typically noted as responding fairly well to physical therapy, although she continued to experience some neck pain. See, e.g., Exh. 1-a at 000547-49, 000561-62, 000566-68, 000625-27, 000692-94; D. 60 ¶¶ 71-80. During a session on June 12, 2025, Petie reported that her neck was feeling better but was fatigued and aching from recently painting at her home. Exh. 1-a at 000606-07; D. 60 ¶ 75. Two weeks later, on June 26, 2025, Petie reported that she was sore from moving household items but was doing physical work again. Exh. 1-a at 000576-77; D. 60 ¶ 76. In August 2025, Petie reported that neck pain limited the amount of time she could ride a motorcycle, and she reported in September 2025 that she had aggravated her neck when she hit a pothole. See Exh. 1-a at 000515-16, 000548; D. 60 ¶¶ 79-80. On September 30, 2025, Petie reported a recent increase in upper neck pain. See Exh. 1-a at 000914-15; D. 61 ¶ 96.

63.     The parties presented conflicting medical opinions at trial: Dr. Chao's on behalf of Petie and Dr. Banco's on behalf of the government.

64.     The Court credits the opinion of Dr. Banco, which is supported by the objective evidence in the record including x-rays, MRIs and medical records and is consistent with the subjective evidence that the Court credits.

13

65.     Based upon the totality of evidence, the Court credits Dr. Banco's opinion that Petie suffered Grade 1 whiplash at the collision.[50]

**D.      Current Status**

66.     Petie is currently self-employed as a graphic designer for funeral homes, the same employment she held at the time of the collision.  D. 61 ¶ 112; see D. 60 ¶ 86.[51]

67.     Petie contends that because of the injuries she suffered in the collision, she is unable to engage in certain activities without incurring increased neck pain.  For example, Petie claims that she does not ride her motorcycle as often as she did prior to the accident, but she testified that she continues to own and ride a motorcycle, with limitations, since the collision.[52]  Petie and John planned a multi-state motorcycle trip from Indiana to Virginia in fall 2022.[53]  Additionally, Petie purchased a new, upright motorcycle in 2024, which she modified to make more comfortable.[54] Although the government asks the Court to find that Petie can ride comfortably for two to three hours, see D. 60 ¶ 81, Petie testified that she cannot ride for extended lengths and requests to stop every sixty to ninety minutes.[55]

68.     Petie also claims that her ability to engage in physical exercise has been impacted because of the injuries suffered in the collision.  She testified that, although she was an avid runner prior to the collision, she is no longer as physically active now.[56]  The objective medical records demonstrate that prior to the collision, Petie was suffering from multiple physical ailments that severely impacted her ability to run.[57]  D. 60 ¶ 82.

---

[50] IV:20.
[51] See I:114, 119-20.
[52] I:149-50; III:61.
[53] I:106-07.
[54] I:100, 107, 149-50.
[55] I:149.
[56] III:52-58.
[57] III:52-56.

69.     Additionally, the records demonstrate that Petie continued to engage in some exercise post-accident.  Petie noted in her physical therapy initial intake paperwork in March 2022 that she exercised.  Exh. 1-c at 000199.  Petie testified that she walks her dogs about one mile every day.[58]  Petie also told a physician assistant in January 2025 that she exercised for thirty minutes every evening.  Exh. 1-a at 000830; see D. 60 ¶ 83.

70.     Petie also claims that the collision decreased her ability to perform house and yard work.  However, Petie's medical records indicate that she was experiencing pain post–house and yard work even prior to the collision.  For example, she claimed to have suffered from neck pain after engaging in yard work in August 2020.  See Exh. 1-a at 000068.  Petie also testified that the neck pain she was experiencing in May 2021 prior to the accident, see id. at 000018, was due to engaging in yard work.[59]  See D. 60 ¶ 84.

71.     Petie continues to engage in these types of activities.  For example, physical therapy records from March 2022 indicate that Petie was using a staple gun for a home project.  Exh. 1-c at 000188.  In June 2025, Petie reported soreness after painting at her home and moving household items.  Exh. 1-a at 000577, 000607.  Petie's records, therefore, depict post-activity soreness both before and after the collision.  D. 60 ¶ 85.

72.     Petie testified that the ACDF surgery stopped the numbness and tingling she was experiencing but not the pain.[60]

### E.     Damages

73.     Petie seeks damages for pain and suffering as well as past medical expenses and the cost for future medical care.  D. 1 ¶ 19; id. at 3-4; D. 60 ¶¶ 20-22.

---

[58] III:57-58.
[59] I:124; III:49-50.
[60] I:139.

## IV.   CONCLUSIONS OF LAW

In light of the evidence presented to the Court, the Court makes the following conclusions of law:

### A.   <u>Legal Framework</u>

1.   Petie's claims are governed by the requirements of the FTCA, 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), 2671-2680, and, accordingly, by the substantive law of Massachusetts.  <u>See, e.g.</u>, <u>Bolduc v. United States</u>, 402 F.3d 50, 56 (1st Cir. 2005); <u>see also</u> 28 U.S.C. § 1346(b)(1).

2.   To prevail on a negligence claim under Massachusetts law, a plaintiff must prove by a preponderance of the evidence that (1) the defendant owed her a duty of reasonable care, (2) the defendant breached that duty, (3) the plaintiff was injured and (4) the defendant's breach caused the injury.  <u>Creatini v. McHugh</u>, 99 Mass. App. Ct. 126, 129 (2021) (citing <u>Jupin v. Kask</u>, 447 Mass. 141, 146 (2006)).

3.   It is undisputed that Hall was operating the LLV in the scope of his employment as an employee of USPS at the date and time of the LLV's collision with the Mercedes occupied by Petie.  <u>See</u> D. 60 ¶¶ 1, 3; D. 61 ¶ 14.  The government is only liable for Hall's actions based on respondeat superior liability, however, if the Court concludes that Hall was negligent.  <u>See</u> <u>Lozada-Manzano v. United States</u>, 75 F.4th 31, 38 (1st Cir. 2023).

### B.   <u>Duty of Care</u>

4.   "Massachusetts law imposes a duty on a driver of a motor vehicle to exercise reasonable care in the operation of his or her vehicle.  A driver breaches that duty if he or she fails to exercise the degree of care that a reasonably prudent driver would have exercised under the same or similar circumstances."  <u>Corriveau v. United States</u>, 832 F. Supp. 19, 23 (D. Mass. 1993) (internal citation omitted); <u>see</u> <u>Quinones v. U.S. Postal Serv.</u>, No. 12-cv-10120-JGD, 2013 WL

1328343, at \*6 (D. Mass. Mar. 29, 2013); Deguio v. United States, 732 F. Supp. 1240, 1245 (D. Mass.), aff'd, 920 F.2d 103 (1st Cir. 1990).

5.      Accordingly, at and around the time of the collision, Hall had a duty to operate the LLV with a reasonable degree of care, which duty extended to Petie.

C.      **Breach of Duty**

6.      "[I]t is settled that the mere fact that a defendant's vehicle strikes another vehicle in the rear does not establish negligence on the part of the defendant."  Mantak v. Sahagian, 2 Mass. App. Ct. 871, 871 (1974) (rescript) (citing Jennings v. Bragdon, 289 Mass. 595, 597 (1935)). "Evidence of the happening of a collision between the two motor vehicles—even if a rear-end collision—without evidence of the circumstances under which it happened is not proof of negligence of the operator of either of them."  Hendler v. Coffey, 278 Mass. 339, 340 (1932); see, e.g., Varisco v. Malovin, 356 Mass. 712, 714 (1970) (noting that plaintiff had "merely shown that his car was hit by another car while stopped on a crowded four lane highway" and there was "no evidence concerning the position of the defendant's car in relation to the plaintiff's when stopped, nor evidence that the plaintiff's car was struck with such force that an inference of negligence [was] permissible"); Goyette v. Amor, 294 Mass. 355, 357 (1936) (explaining that "the mere skidding of a motor vehicle, unexplained, is not evidence of negligence"); Jean-Michel v. Suarez, 77 Mass. App. Ct. 1104 (2010) (summary disposition) (noting that "the plaintiff offered no evidence relevant to the alleged negligence of the defendant other than the fact that a rear-end collision occurred on an icy road under driving conditions that the plaintiff acknowledged as terrible").

7.      Courts have noted, however, that "a finding of negligence in such a case may be warranted on slight evidence of the circumstances," Olofson v. Kilgallon, 362 Mass. 803, 805-06

(1973) (explaining that judge "could find" that driver should have seen car in which plaintiffs were passengers and "ought to have anticipated standing automobiles at a red light"), although such does not create "a different burden of proof for rear-end collision cases," see Johnson v. Hunnewell, 100 Mass. App. Ct. 1112 (2021) (summary disposition).

8.     In Massachusetts, a statutory violation "is considered . . . some evidence of negligence, the ultimate assessment being left to the fact finder." Deguio, 920 F.2d at 107.  A driver on Massachusetts roadways must limit his speed to what is "reasonable and proper," and operation in excess of a duly posted speed limit is prima facie evidence that the driver's speed is not reasonable and proper.  Mass. Gen. L. c. 90, § 17.  Moreover, "notwithstanding such establishment of a speed limit, every person operating a motor vehicle shall decrease the speed of the same when a special hazard exists . . . by reason of weather or highway conditions."  Id.

9.     In traveling above the posted speed limit and failing to adjust his speed to account for the wet road conditions, Hall was driving the LLV at a speed that was not "reasonable and proper," see Mass. Gen. L. c. 90, § 17, which is some evidence of his negligence, see Deguio, 920 F.2d at 107.

10.     The evidence in the record supports that in other ways, Hall acted as a reasonably prudent person at the time of the collision.  As discussed above, the Court finds that Hall was not using his cell phone while operating the LLV and finds that his hands were on the LLV's steering wheel.  Additionally, Hall braked and steered the LLV towards the right side of the road in an effort to avoid a collision which the Mercedes, which lessened the ultimate contact between the vehicles.

11.     The government asked the Court to find that Hall could not have anticipated that John would have stopped the vehicle short of the stop bar at the intersection and that accordingly,

Hall may not have had sufficient time to come to a stop behind the Mercedes, especially considering the weather conditions. See D. 60 ¶ 35. The Court concludes otherwise, however, considering its findings that Hall knew he was approaching an intersection and that he had an unobstructed view of the road for about a quarter mile leading up to the intersection.

12.    Accordingly, the Court concludes that Hall was negligent in his operation of the LLV around the time of the collision.

### D.    Causation

13.    Regardless, however, the Court concludes that Petie has not met her burden of showing causation as to most of her claimed injuries.

14.    "[A] defendant cannot and should not be held liable for a harm unless the defendant caused the harm." Doull v. Foster, 487 Mass. 1, 6-7 (2021). This typically requires that a defendant be both a factual cause of the plaintiff's harm, meaning that it would not have occurred "but for" the defendant's conduct, and a legal cause of the harm, meaning that the harm was within the scope of the foreseeable risk arising from the defendant's negligence. Id. at 7-8.

15.    Petie must "prove, by a preponderance of the evidence, a causal connection between the collision and each of her injuries." Cahillane v. United States, No. 22-cv-30156-MGM, 2025 WL 2526232, at *1 (D. Mass. Sept. 3, 2025). Based on the evidence presented at trial that the Court credits, Petie suffered a low-grade whiplash injury from the low-speed collision on August 22, 2021. Apart from the discomfort Petie experienced in the immediate aftermath of the collision and the ensuing few weeks, Petie has not met her burden of showing that her claimed injuries were caused by the collision, as opposed to preexisting conditions that were not exacerbated by the accident. See D. 60 ¶ 27.

16.    Rather, Dr. Banco credibly testified that other than a minor whiplash injury that should have resolved within two to four weeks, the injuries that Petie claims were not caused by the motor vehicle accident.[61]  "The [C]ourt does not doubt the sincerity of [Petie's] belief that she would be in significantly better overall health today had the collision not occurred, but her intuitive belief is not an accurate or reliable measure of causation."  Cahillane, 2025 WL 2526232, at *2.

17.    The evidence reflects that Petie was experiencing neck pain consistent with age-related degenerative changes prior to the 2021 collision, including pain in the right side of her neck over several months in 2020.  Exh. 1-a at 000062; see D. 60 ¶¶ 36-37.

18.    Approximately two months before the collision, Petie reported several weeks of neck pain that she characterized as an ache, and constant.  Exh. 1-a at 000024.  Petie's provider diagnosed her with chronic neck pain.  Id. at 000017.  A cervical x-ray around this time showed mild degenerative C4-C5 disc space narrowing and degenerative changes of the cervical spine.  Id. at 000014, 001326.  As Dr. Banco testified, this imaging showed typical age-related changes for a fifty-three-year-old adult, which he opined were also consistent with the neck pain she reported in 2020.[62]  See D. 60 ¶ 39.  As Dr. Banco explained, aging spinal discs and bulges within the cervical spine are normal findings in adults of Petie's age, and disc bulges are frequently observed in asymptomatic patients.[63]  Id. ¶ 40.

19.    Further, the Court credits Dr. Banco's testimony that there was no objective evidence of nerve compression at C4-C5 and that even such compression would not have caused the tingling Petie experienced in her hands.[64]  See id. ¶ 41.

---

[61] IV:20, 75.
[62] IV:27.
[63] IV:28-29, 50, 69-70.
[64] IV:107-08; see id. at 94.

20.     The Court finds that Petie was experiencing neck pain and degenerative changes well before the August 22, 2021 collision and concludes that she has not shown that the neck pain she has experienced years after the accident was causally related.

21.     As Dr. Banco testified, treatment for the type of injuries incurred in a low-speed collision such as the one Petie was involved in typically includes anti-inflammatory and/or pain medications to treat symptoms.[65]  Accordingly, as discussed below, the Court concludes that Petie has not shown that the other treatments she received were reasonably necessary to treat an injury caused by the collision.

22.     When Petie called her medical provider on August 23, 2021, she reported that she had been in a rear-end collision.  Exh. 1-a at 000343.  She complained of neck and shoulder "sore[ness]" with a mild headache.  Id.  She did not report any loss of range of motion at that time. Id.  As Dr. Banco testified, the absence of any complaints regarding loss of range of motion suggested that Petie was not showing signs of soft tissue damage in the neck.  See D. 60 ¶ 44.[66]

23.     There is no evidence within the medical records of a traumatic head injury or a significant whiplash injury caused by the low-speed collision.  When Petie was evaluated on August 25, 2021, three days after the accident, she denied experiencing severe headaches or changes in vision or speech problems and demonstrated a supple neck.  Exh. 1-a at 000340.  Upon examination, she was able to move her neck with pain only on flexion and extension, and she had no pain with rotation and lateral movement.  Id.

24.     As Dr. Banco explained, X-rays taken on August 25, 2021, see id. at 000337, showed normal alignment with normal prevertebral soft tissues, findings that he opined are

---

[65] IV:75.
[66] IV:34-35.

consistent with a low-speed collision.[67]  The x-rays provide objective evidence that Petie did not suffer a significant injury due to the collision.  D. 60 ¶ 46.

25.    Dr. Bizzak also testified regarding a small, published study involving staged rear-end collisions, which indicated that collisions of the severity experienced by Petie's vehicle did not result in permanent injury to the occupants of the vehicle, even if the occupant has a pre-existing degenerative cervical or lumbar spine condition.  Id. ¶ 47.[68]

26.    Dr. Banco also credibly testified that Petie's head CT on August 27, 2021 returned normal results.  Exh. 1-a at 001329; D. 60 ¶ 48.[69]

27.    Despite Petie's claim that she still continues to experience daily headaches that began post-collision, the medical records indicate that Petie's headaches had resolved within a month of the accident, see Exh. 1-a at 000323; D. 60 ¶ 49, and she agreed at trial that her medical records do not support a claim that she has experienced daily headaches since the collision.[70]

28.    Despite Dr. Rivera's conclusion on November 17, 2021 that Petie suffered a whiplash injury and possible small disc herniation, Dr. Banco testified credibly that there was no evidence of a disc herniation on the MRI scan dated November 2, 2021.  Nor did Dr. Banco discern any evidence within the medical record of a significant whiplash injury to the cervical spine, as evidenced by the lack of prevertebral swelling on the August 25, 2021 imaging.  Instead, as Dr. Banco agreed, the MRI demonstrated diffuse moderate disc bulging at C4-C5 and mild bulging at C5-C6 with no evidence of nerve compression.  Exh. 1-a at 001330.  There was no prevertebral swelling noted in the findings, nor was the whiplash injury noted.  Id.  As Dr. Banco testified, the MRI demonstrated standard, age-related changes to Petie's cervical spine.  And, as Dr. Banco

---

[67] IV:36-38.
[68] III:97-99.
[69] IV:41-44.
[70] III:17.

testified, Petie at most suffered a "grade 1" whiplash injury with headaches that resolved by September 15, 2021.  D. 60 ¶ 50.[71]

29.     Dr. Banco testified credibly that Petie's July 28, 2022, ACDF surgery was not medically necessary or causally related to the low-speed collision.[72]  Further, as to Petie's reports of lingering discomfort post-surgery, Dr. Vraney advised Petie that there was nothing alarming in the imaging and that her x-rays showed a solid fusion.  Exh. 1-d at 000045-47.  Dr. Vraney moved forward with essential removal of restrictions for Petie within months of the surgery, and he noted that any continued discomfort for Petie may be related to degenerative changes.  Id. at 000037-40.  As Dr. Banco testified, there is no objective medical evidence to support Petie's subjective complaints of pain or discomfort or that these complaints are related to injuries sustained in the collision.[73]  See D. 60 ¶ 54.

30.     In light of the Court's conclusion regarding causation, the Court also concludes that, to the extent Petie claims sleep loss, emotional distress, vertigo and/or a loss of intimacy with John as a result of the collision, or future damages, she has not met her burden as to same.

### E.     Damages

31.     In "an FTCA case, both the nature of allowable damages and the measure of those damages are drawn from state law."  Limone v. United States, 579 F.3d 79, 103 (1st Cir. 2009).

32.     "While proof of damages does not require mathematical precision, it must be based on more than mere speculation."  Fisher v. United States, 705 F. Supp. 2d 57, 73 (D. Mass 2010) (quoting Squeri v. McCarrick, 32 Mass. App. Ct. 203, 209 (1992)).  Petie bears the burden of

---

[71] IV:36-37, 48-51, 53-54, 91.
[72] IV:78, 80, 107-09.
[73] IV:81-82.

proving her damages with reasonable certainty.  See Smith v. United States, 752 F. Supp. 3d 242, 269 (D. Mass. 2024).

33.    "A plaintiff who has suffered physical injury through the fault of a defendant is entitled to recover for pain and suffering; for reasonable expenses incurred by [her] for medical care and nursing in the treatment and cure of [her] injury; for diminution in [her] earning power; and for such pain and suffering and such expenses and diminution of earning capacity as are shown to be reasonably probable to continue in the future."  Fisher, 705 F. Supp. 2d at 72-73 (quoting Rodgers v. Boynton, 315 Mass. 279, 280 (1943)); see Law v. Griffith, 457 Mass. 349, 351 (2010) (noting that at common law, "a plaintiff injured by a defendant's negligence is entitled to recover the value of reasonable medical services required to treat the injury").

34.    Because the Court finds that Petie's injuries caused by the collision resolved within weeks of the accident, she is not entitled to damages for continued treatment beyond that period.

35.    The Court has reviewed Petie's certified medical bills, which were admitted without objection at trial.[74]  See Exh. 2; Urizar-Mota v. United States, 171 F.4th 445, 471-73 (1st Cir. 2026) (discussing trial court review of medical expense evidence).  The records from Reliant Medical Group evidence services rendered as to Petie's August 25, 2021 office visit and x-ray, August 27, 2021 CT scan and September 15, 2021 follow-up office visit.  See Exh. 2-a at 000003, 000019.  Without explanation, however, Petie's records include two sets of bills (obtained at different times from Reliant Medical Group, see id. at 000001 (reflecting that records were obtained in 2022), 000004 (reflecting that records were obtained in 2023)) for those visits.  The medical records obtained in 2022 reflect $1,050 in charges for the relevant services, see id. at 000003, whereas the records obtained in 2023 reflect charges exactly twice the amount ($2,100)

---

[74] I:17.

24

for what appear to be the same services on the same dates, see id. at 000019.  In a chart submitted with her revised proposed findings of fact and conclusions of law, Petie summarizes her alleged medical damages and, as to these visits, appears to seek the sum of the charges reflected in both versions of these records ($3,150).  See D. 61 at 27.  An annotation to the chart suggests, the Court surmises, that the 2022 records reflect "Physician's Bills," see id., whereas the 2023 records reflect the bills of other providers, but the Court sees no basis in the evidence for this conclusion.

36.     "Courts have repeatedly warned litigants that damages 'must be computed in some rational way upon a firm factual base.'"  Ondine Shipping Corp. v. Cataldo, 24 F.3d 353, 357 (1st Cir. 1994) (quoting Reliance Steel Prods. Co. v. Nat'l Fire Ins. Co., 880 F.2d 575, 578 (1st Cir. 1989)).  The Court credits the 2023 records, which purport to reflect "a true and complete copy of the billing records of Reliant Medical Group kept by the Reliant Medical Group," Exh. 2-a at 000004, whereas the 2022 records are from "Physician Billing Services" within Reliant Medical Group, see id. at 000001.  Accordingly, the Court will award damages for medical expenses in the amount of $2,100.

37.     Neither party raised whether or how Petie's damages claim here interacts with the Commonwealth's no-fault insurance framework, which limits tort recovery for motor vehicle collisions, including against the government.  See, e.g., Plymouth Rock Assurance Corp. v. U.S. Postal Serv., No. 23-cv-10757-FDS, 2023 WL 8238886, at *2-3 (D. Mass. Nov. 27, 2023) (explaining interaction of personal injury protection ("PIP") benefits and tort recovery); Adams v. United States, 964 F. Supp. 511, 526 (D. Mass. 1996) (reducing damages award, in case involving alleged negligence of USPS driver, to account for PIP benefits); Kitson v. United States, No. 91-cv-12256-Z, 1992 WL 359640, at *1 (D. Mass. Nov. 16, 1992) (reducing judgment against the United States to account for PIP benefits paid to plaintiff); cf. Figuereo v. Valverde, 60 Mass. App.

Ct. 76, 80 (2003) (noting that the "general rule of the statute is that if PIP benefits are not available, the exemption from tort liability is not available").  Because the government has not presently suggested that any offset is appropriate, the Court does not reduce Petie's damages award.

38.    Also relevant, however, the no-fault insurance law precludes tort recovery for pain and suffering damages unless a plaintiff's medical expenses exceed $2,000, subject to exceptions not relevant here.  Mass. Gen. L. c. 231, § 6D; see Bajowski v. Sysco Corp., 115 F. Supp. 2d 133, 136-37 (D. Mass. 2000) (describing threshold requirement).  Petie bears the burden of demonstrating that she has met this threshold amount.  Lima v. Marshall, 70 Mass. App. Ct. 424, 425-26 (2007); see Chenell v. Cent. Wheelchair & Van Transp., Inc., 94 Mass. App. Ct. 1102 (2018) (summary disposition) (explaining that a "trier of fact may reasonably infer, based on certified medical records of the plaintiff's treatment, that his or her medical expenses, necessitated solely by and causally related to the subject motor vehicle accident, [were] (or [were] not) in excess of the $2,000 threshold").

39.    Consistent with the Court's conclusion regarding Petie's medical expenses, the Court concludes that she is eligible for damages for her pain and suffering in the weeks following the collision.  Considering all of the evidence presented at trial, the Court awards Petie $500 as compensation for pain and suffering.

## V.    CONCLUSION

After consideration of the evidence presented at trial and in light of the aforementioned findings of fact and conclusions of law, this Court finds that judgment will enter in favor of Petie in the amount of $2,600.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge